IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| BREANN KANIEWSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18 – cv – 02082 |
| | ) | |
| ROUNDY'S ILLINOIS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This is a Title VII pregnancy discrimination lawsuit. Plaintiff worked as a pharmacy technician at Mariano's Shorewood location for nine months, then left for a three-month pregnancy leave and never returned. After her child was born, Plaintiff met with her manager to discuss her availability in anticipation of her returning from leave. Plaintiff explained that she would require a modified work schedule to accommodate her childcare needs. In response, her manager proposed a schedule of 25 hours per week. That schedule, if implemented, would have moved Plaintiff from a "full-time" employee to "part-time" status under Mariano's Collective Bargaining Agreement (the "CBA"). A move to part-time status, in turn, would have caused Plaintiff to drop from a "Level 3" to a "Level 2" on the CBA's pay scale, resulting in a decreased hourly wage.

However, the proposed part-time schedule was never implemented. Instead of returning to work on December 19, 2016, Plaintiff faxed her letter of resignation to Mariano's on December 17, 2016. Plaintiff admits she never worked under the proposed part-time schedule, and acknowledges her pay was never decreased. Consequently, she never experienced an "adverse employment action." Nor can Plaintiff identify any non-pregnant employees who were treated more favorably than her. Mariano's is therefore entitled to summary judgment as a matter of law.

## I. UNDISPUTED MATERIAL FACTS

Pursuant to Fed. R. Civ. P. 56(c)(1) and Local Rule 56(a)(3), Mariano's respectfully submits and incorporates its Separate Statement of Undisputed Facts ("SSUF").

## II. ARGUMENT

### A. PLAINTIFF'S "PREGNANCY DISCRIMINATION" CLAIM FAILS AS A MATTER OF LAW

Plaintiff's single-count Complaint alleges a claim for "pregnancy discrimination" under Title VII, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) (the "PDA"). (Dkt. No. 1, p. 3). Plaintiff acknowledges she has no "smoking gun" evidence. (SSUF, ¶¶ 46-47). Consequently, to survive summary judgment, Plaintiff would need to present circumstantial evidence that is both reliable (*i.e.*, "evidence on which a reasonable jury could rely") and sufficient to prove each element of her claim. *Porter v. City of Chicago*, 700 F.3d 944, 956 (7th Cir. 2012).

In the wake of *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760 (7th Cir. 2016), courts continue to utilize the *McDonnell Douglas* burden-shifting framework "a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).[1] Under that framework, the plaintiff bears the initial burden of presenting sufficient evidence to establish a *prima facie* case of discrimination. (*Id.* at 225). If the plaintiff can state a *prima facie* case, the burden shifts to her employer, who must articulate a legitimate, non-discriminatory reason for its employment action. (*Id.*). The burden would then shift back to plaintiff to show her employer's explanation is merely "pre-text" for unlawful discrimination. (*Id.*). Ultimately, a plaintiff must show "if all the pertinent facts were as they are except for the fact of

---

[1] Although *Ortiz* dealt generally with employment discrimination claims, the Seventh Circuit has applied its holding in the context of retaliation claims as well. *See, e.g.*, *Rowlands v. United Parcel Service - Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018). Regardless of the framework utilized to conduct the analysis, the central question on summary judgment remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224.

2

her pregnancy, she would not have been fired." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 739 (7th Cir. 1994). Plaintiff's lawsuit fails at the outset, because she cannot state a *prima facie* case.

### 1. **Plaintiff Cannot State a *Prima Facie* Case of Pregnancy Discrimination**

To state a *prima facie* case of pregnancy discrimination, Plaintiff must present sufficient evidence establishing each of the following elements: (1) she was pregnant and Mariano's knew she was pregnant; (2) she was performing her job duties satisfactorily; (3) she suffered an adverse employment action; and (4) Mariano's treated similarly-situated, non-pregnant employees more favorably than her. *Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 844 (7th Cir. 2007). In this case, Plaintiff is unable to establish either of the last two elements.

#### a. **Plaintiff did not suffer an adverse employment action – (she was not "constructively discharged")**

Plaintiff faxed her letter of resignation to Mariano's the evening of December 17, 2016, terminating her employment effective that same day. (SSUF, ¶ 31). Because "an employee who voluntarily resigns cannot be said to have experienced an adverse employment action," Plaintiff's entire lawsuit is premised on a theory of "constructive discharge." *Kawczynski v. F.E. Moran, Inc.*, 238 F. Supp. 3d 1076, 1084 (N.D. Ill. 2017), citing *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 235 (7th Cir. 2014). A "constructive discharge" occurs only where an employee was "forced to resign because [her] working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010).

The Seventh Circuit recognizes two different types of constructive discharge, "but neither dispenses with the requirement that the work environment had become intolerable." (*Id.*). The first type of constructive discharge involves resignations due to discriminatory harassment, while the second involves resignations prompted by employer-behavior that communicates to a reasonable employee she will soon be fired. (*Id.*). The undisputed material facts in this case cannot support either theory of constructive discharge – consequently, Plaintiff did not suffer an adverse action.

3

### i. Plaintiff did not experience "discriminatory harassment" constructive discharge

A plaintiff who alleges constructive discharge by way of harassment must demonstrate a work environment "even more egregious than the high standard for hostile work environment." *EEOC v. Univ. of Chicago Hosps.,* 276 F.3d 326, 332 (7th Cir. 2002). This is because employees are generally expected to remain employed while seeking redress so that their employer may have an opportunity to remedy the problem. *Whittaker v. Northern Illinois Univ.,* 424 F.3d 640, 648 (7th Cir. 2005). Plaintiff's theory of constructive discharge fails because the conduct of which she complains either: (a) never materialized, or (b) does not rise to the level of actionable harassment.

### (a) Plaintiff quit <u>before</u> experiencing any reduction in hours or pay

Plaintiff alleges she was "constructively and retaliatorily terminated" when Mariano's "slashed [her] pay down to minimum wage;" "cut her hours from full-time to…part-time status;" and indicated "there was no guarantee that she would be scheduled for any hours at all." (Dkt. No. 1, p. 2, ¶¶ 10-11). Plaintiff admits, however, that she voluntarily resigned from Mariano's ***before*** she experienced any reduction in hours or pay. (SSUF, ¶¶ 68-70, 76-77). Her decision to never return from her leave of absence – even under the schedule proposed by her manager – is fatal to her claim that she was constructively discharged.

The Seventh Circuit's opinion in *Whittaker* is directly on point. The plaintiff in *Whittaker* received a three-day, unpaid suspension. 424 F.3d at 643. Two weeks before her suspension was scheduled to begin, however, the plaintiff "took a leave of absence from which she never returned." *Id.* at 644. Because the plaintiff voluntarily left her job before the suspension took effect, the court found she never suffered an adverse employment action:

> So, whether it be her sex discrimination or retaliation claim, Whittaker must show that she suffered an adverse employment action. Indeed, we need look no further than this required element – and Whittaker's failure to satisfy it – to dispose of both claims. Typically, adverse employment actions are economic injuries. For that

4

> matter, a suspension without pay – such as the three-day suspension that Whittaker was scheduled to serve between May 31 and June 2, 1999 – would constitute an adverse employment action. However, because she voluntarily left her job in mid-May – taking a leave of absence from which she would never return – she never actually served this suspension. And because she never served the suspension, she never realized any economic effect from the slated employment action. ***Simply put, a suspension without pay that is never served does not constitute an adverse employment action.***

*Id.* at 647 (emphasis added, citations omitted). Accordingly, the court affirmed summary judgment in favor of plaintiff's employer on her discrimination and retaliation claims. *Id.* at 649.

This Court has followed *Whittaker* to find that an employee who receives a reduced work schedule, but quits before actually working the new schedule, has not sustained an adverse employment action. *Golden v. World Security Agency, Inc.*, 884 F. Supp. 2d 675 (N.D. Ill. 2012). Two of the plaintiffs in *Golden* were given work schedules with reduced hours, but quit before their schedules took effect. *Id.* at 685. The Court found the mere *potential* for lost income, based on a reduced schedule that was never actually worked, did not constitute an adverse action:

> [T]he Court concludes that *Whittaker* forecloses Golden's and Moore's claims. The reasoning in that case depended on the plaintiff having left her job before serving the suspension, because "an action which, it turns out, had no effect on an employee is not an adverse action." **Just as in *Whittaker*, the reduction in Golden and Moore's hours had no effect on them because they quit their employment before working the new schedule.**
>
>         \*        \*        \*
>
> In *Whittaker,* as in this case, the plaintiff was aware that the challenged action would have an effect on a subsequent paycheck – an outcome that might dissuade a reasonable worker from complaining to his employer. In both cases, however, the plaintiff quit before receiving the lower paycheck, and the last paycheck the plaintiff actually received was not affected by the potentially adverse action. If this situation could not constitute a "realized" economic injury in *Whittaker,* the Court does not see how it can do so in this case. The Court therefore grants summary judgment in favor of defendants . . . .

*Id.* at 693–94 (internal citation omitted, emphasis added).

More recently, this Court found that an employee who was given a choice to either resign or accept a position that "would have resulted in a 25 percent pay reduction that she could not

afford" was not constructively discharged. *Hamer v. Neighborhood Hous. Servs. of Chicago,* 2015 WL 5439362 at *12 (N.D. Ill. Sept. 10, 2015) ("While the Court recognizes that accepting the administrative position was not preferable to Plaintiff because of the reduction in pay and the increased travel expenses, her situation does not rise to the level of being intolerable."). [2]

In this case, Plaintiff admits she never experienced the reduction in hours or compensation upon which her lawsuit is based:

> Q: Miss Kaniewski, you never tried to work under this supposed new schedule, did you?
>
> A: No.
>
> \* \* \*
>
> Q: Well, can you identify a single day that you worked at Mariano's where your pay had been cut?
>
> A: I didn't so, correct.
>
> \* \* \*
>
> Q: Okay. And the actual number of hours that you worked at Mariano's for reduced pay was 0.0 hours, correct?
>
> A: Correct.

(SSUF, ¶¶ 68, 70).[3] When Plaintiff met with her manager, Ryan Tutko, in December of 2016 to discuss her return from leave, Mr. Tutko provided her with a copy of his "scheduling notes," which contemplated scheduling Plaintiff for only 25 hours per week, starting December 19, 2016. (*Id.*, ¶¶ 36-37, 42). Based on those scheduling notes – which were *not* the official store schedule – Plaintiff **assumed** Mr. Tutko had "cut her hours" (which, in turn, would have caused her to move

---

[2] *See also, Grube v. Lau Indus., Inc.,* 257 F.3d 723, 728 (7th Cir. 2001) (employer's "decision to change [plaintiff's] working hours certainly does not rise to the level of an adverse employment action."); *Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520, 531 (7th Cir. 2003) (no adverse employment action where employee was informed of impending demotion but never actually demoted); *Nagle v. Village of Calumet Park,* 554 F.3d 1106, 1120-21 (7th Cir. 2009) (employee who successfully resolved disciplinary suspension through union grievance did not suffer adverse action); *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 697 (7th Cir. 2017) ("unfulfilled threats of discipline" are not actionable).

[3] Plaintiff also admits she was never denied a location or opportunity to pump at Mariano's. (SSUF, ¶ 87).

6

to part-time status, and dropped her from "Level 3" to "Level 2" on the Union wage scale). (*Id.*, ¶¶ 40-57). Instead of showing up to work on December 19, 2016, however, Plaintiff chose to voluntarily resign on December 17, 2016. (*Id.*, ¶ 31). Consequently, she never worked the part-time schedule that Mr. Tutko had proposed, and her wages were never reduced. (*Id.*, ¶¶ 68-77).

Had Plaintiff not resigned, she would have learned that neither Mr. Tutko, nor Jordan Kulawiak (the "PSM," who was responsible for creating the weekly store schedule), had the authority or *ability* to schedule her for less than full-time hours – indeed, the scheduling software would not have permitted it. (SSUF, ¶¶ 52-61, 73, 78-79). This is precisely why the Seventh Circuit advises, "[t]he only way to know how matters will turn out is to let the process run its course. Litigation to determine what *would* have happened…is a poor substitute for the actual results of real deliberation within the employer's hierarchy." *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333-34 (7th Cir. 2004) (emphasis original).

### (b) Mr. Tutko's alleged behavior does not constitute actionable harassment as a matter of law

Plaintiff also alleges that Mr. Tutko made "derogatory comments" before she went on leave. (Dkt. No. 1, p. 2, ¶ 7). Assuming *arguendo* that Mr. Tutko engaged in the conduct alleged by Plaintiff, this would be insufficient to support a claim for constructive discharge. The rare cases in which workplace harassment is "more egregious than the high standard for hostile work environment" *Univ. of Chicago Hosps.,* 276 F.3d at 332, typically involve physical contact or threats of physical violence. *See, e.g., Porter v. Erie Foods, Int'l, Inc.,* 576 F.3d 629, 640 (7th Cir. 2009) (constructive discharge where discriminatory harassment involved repeated use of noose and implied threats of physical violence); *Taylor v. W. & S. Life Ins. Co.,* 966 F.2d 1188, 1191 (7th Cir. 1992) (constructive discharge where supervisor held firearm to plaintiff's head, took a picture, and circulated it at a company meeting while making racial jokes).

7

Conversely, the Seventh Circuit found no constructive discharge where a plaintiff was told (among other things) that she had to relocate out of state to keep her current position or else transfer to another region. *Fischer v. Avanade, Inc.,* 519 F.3d 393, 410 (7th Cir. 2008). The court noted that while these were "not circumstances an employee would wish upon herself," her working conditions had not become "unbearable" such that Title VII protections were triggered. (*Id.*).[4]

The conduct Plaintiff ascribes to Mr. Tutko in this case is neither severe nor pervasive, and comes nowhere close to creating an "intolerable" work environment for any reasonable employee. According to Plaintiff, Mr. Tutko made *two* comments about motherhood, which she construed as "derogatory" towards her pregnancy: (a) he told her, "working with kids would not work out;" and (b) he suggested Plaintiff "would not be able to work the schedule he would demand." (SSUF, ¶ 88). Plaintiff testified that Mr. Tutko made these comments only "a few" times, and she could not remember when she heard them. (*Id.*, ¶ 89). Plaintiff never advised Mr. Tutko she was bothered by his remarks, nor did she identify them as a reason for her resignation. (*Id.*, ¶¶ 31, 89-90).[5]

The idea that Mr. Tutko would make these comments defies common sense. Mr. Tutko knew that Plaintiff was *already* a mother, and had been successfully "working the schedule that he demanded" since the start of her employment. (*Id.*, ¶ 91). Nonetheless, Mariano's will assume

---

[4] *See also, Fabiyi v. McDonald's Corp.,* 595 F. App'x 621, 623 (7th Cir. 2014) (two isolated incidents, about a year apart, where male coworker allegedly rubbed buttocks of female employee were not objectively severe or pervasive enough to create an abusive working environment); *Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 886 (7th Cir. 1998) (plaintiffs who were shunned, received harassing phone calls, discovered that someone had gone through papers in their work locker and were told that their safety might be in jeopardy was "unpleasant," but not intolerable).

[5] Although it is not mentioned in her Complaint (Dkt. No. 1) – or her letter of resignation, for that matter (SSUF, ¶¶ 31, 90) – Plaintiff also testified that Mr. Tutko did not allow her to sit while working. (SSUF, ¶¶ 95-96). Plaintiff could not recall how many times Mr. Tutko supposedly denied her the opportunity to sit while working, and she admits he never told her she could never sit at work. (*Id.*, ¶ 100). Nor does she know if Mr. Tutko ever refused to allow a non-pregnant pharmacy technician to sit while working. (*Id.*, ¶¶ 101-102). Regardless, Plaintiff admits she never submitted a request for workplace accommodation to Mariano's, or otherwise engaged the Company in an interactive process as required by the ADA. (SSUF, ¶¶ 97-99); *see also, E.E.O.C. v. Sears, Roebuck & Co.,* 417 F.3d 789, 803-04 (7th Cir. 2005).

for purposes of this motion that Mr. Tutko did, in fact, make them. Mr. Tutko's infrequent and innocuous comments about motherhood are not enough to constitute an "intolerable" work environment. For example, the Seventh Circuit concluded the following conduct by a supervisor was not enough to sustain a claim for pregnancy discrimination:

> (1) soon after [her supervisor] became aware that plaintiff was pregnant, he "repeatedly told [her] that *'if you were my wife, I would not want you working after having children'*" and told other [ ] employees that plaintiff *"should be home with her kids now, with her child now, that she shouldn't be working;"* (2) less than four weeks after plaintiff announced her pregnancy, [her supervisor] wrote a memorandum…criticizing plaintiff's work performance; (3) [her supervisor] responded "Yes" to plaintiff's inquiry as to whether he was building a "case" against plaintiff; and (4) while [her supervisor] and plaintiff were friendly before plaintiff announced her pregnancy, plaintiff claims that *"[s]hortly after [her supervisor] learned of [plaintiff's] pregnancy, [he] became distant, cold, and acrimonious toward [her]."*

*Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 723 (7th Cir. 1998) (emphasis added). "We agree with the district court's conclusion that none of the above comments and conduct by [plaintiff's supervisor] constituted enough evidence to avoid summary judgment on plaintiff's claim that her discharge was a result of intentional discrimination." (*Id.*).

Conduct that is far more "boorish" than what Plaintiff ascribes to Mr. Tutko has been found insufficient to create a hostile work environment. *See, e.g., Mercer v. Cook Cty., Ill.,* 527 F. App'x 515, 521 (7th Cir. 2013) (supervisor's statement ("those bitches") and co-worker's comments ("oh, bitch" and "go play with yourself"), while boorish and offensive, were "neither severe nor pervasive enough to create an objectively hostile work environment."); *Overly v. KeyBank Nat. Ass'n*, 662 F.3d 856, 862–63 (7th Cir. 2011) (supervisor calling plaintiff "cutie" 5 to 10 times over the course of two months not sufficiently severe or pervasive to create hostile work environment); *Scruggs v. Garst Seed Co.,* 587 F.3d 832, 841 (7th Cir. 2009) (supervisor's comments that plaintiff was "made for the back seat of a car" and looked like a "dyke," while offensive, were not objectively severe or pervasive to create a hostile work environment); *Patt v. Family Health Sys.,*

9

*Inc.,* 280 F.3d 749, 754 (7th Cir. 2002) (holding that plaintiff's complaints about eight gender-related comments during course of her employment, including "the only valuable thing to a woman is that she has breasts and a vagina," was insufficient to show hostile work environment). [6]

Moreover, Mr. Tutko allegedly made these "derogatory comments" before Plaintiff went on leave, which was at least three months before she resigned. (SSUF, ¶ 89). Even if Mr. Tutko's comments were objectively severe and pervasive – and, they are not – they were neither temporally nor causally related to her resignation. *See, e.g., Schoenberg,* 140 F.3d at 724 (supervisor's comments five months prior to discharge not temporally or causally related to her termination). Plaintiff tacitly admits as much in her resignation letter, which: (a) expressly states the reason for her resignation was purely economic; and (b) says absolutely nothing about any "derogatory comments" or harassing behavior by Mr. Tutko. (SSUF, ¶¶ 31, 90).

Finally, whatever workplace unpleasantries Plaintiff claims to have experienced at Mariano's – from "derogatory comments" to the prospect of moving to part-time employment – she never found them offensive enough to avail herself of the protections afforded by the CBA's grievance process. (SSUF, ¶ 103). While Plaintiff was not required to file a Union grievance, her failure to do so belies any suggestion that her working conditions were sufficiently "unbearable" to support a theory of constructive discharge:

> In some situations, the standard of reasonableness will require the employee who wants to make a successful claim of constructive discharge to do something before walking off the job….Suppose a worker has just been assigned to a job that he believes to be dangerous to his health, but the work force is unionized and he can file a grievance complaining about the assignment. His failure to do so may be compelling evidence that he, or a reasonable person in his situation, would not actually have found conditions in his new assignment unbearable.

---

[6] *See also, Fugate v. Dolgencorp, LLC,* 555 F. App'x 600, 602 (7th Cir. 2014) (supervisor's "unprofessional, boorish, and age-based" comments – "Oh my god, I can't believe you forgot your teeth!" "What's the matter, is this work getting too much for you?" "Well, you'd know how it is because you guys are the same age. You'd probably forget it too." – while unpleasant, did not meet standard for constructive discharge).

*Lindale v. Tokheim Corp.,* 145 F.3d 953, 955 (7th Cir. 1998) (J. Posner) (citations omitted).[7]

### ii. Plaintiff did not experience "imminent termination" constructive discharge

The second type of constructive discharge requires a showing that, along with a hostile work environment, the employer's actions communicated to the plaintiff that "the handwriting [was] on the wall and the axe was about to fall." *Fischer,* 519 F.3d at 409; *see, e.g., University of Chicago Hosp.* 276 F.3d at 330 (plaintiff returned from vacation to find her belongings packed and her office being used as storage space). There is nothing in this case that would indicate Plaintiff was about to be fired. To the contrary, Mr. Tutko was "desperate" for help, and Plaintiff had just met with him to discuss her availability to *return* to work. (SSUF, ¶¶ 33, 38-42, 80-81).

### b. Plaintiff cannot identify any similarly-situated, non-pregnant pharmacy technicians whom Mariano's treated more favorably than her

Even if Plaintiff had suffered an adverse employment action (and, she did not), her *prima facie* nonetheless fails because she cannot identify any similarly-situated, non-pregnant pharmacy technicians who were treated more favorably than her. Her failure to do so is fatal to her claim. *See, Hutt v. AbbVie Prod. LLC,* 757 F.3d 687, 693 (7th Cir. 2014) (absent comparators, no inference of discrimination arises and plaintiff's disparate treatment claim fails); *see also, Barbera v. Pearson Educ., Inc.,* 906 F.3d 621, 631 (7th Cir. 2018) (same). To satisfy this burden, it is not sufficient for a plaintiff to simply argue her employer generally "did not treat any nonpregnant employees in the same manner as plaintiff was treated." (*see, e.g.,* SSUF ¶ 116). Instead, "a plaintiff must present *specific* evidence that employees who were treated better had the same

---

[7] Nor did Plaintiff take advantage of the multiple reporting mechanisms available to her through Mariano's employment policies. (SSUF, ¶¶ 18, 104-115). She never bothered to inform Christa Bertolini (Mariano's VP of Human Resources) about any workplace issue, even though: (a) Plaintiff had immediate access to Ms. Bertolini's cell phone (SSUF, ¶ 114); and (b) Ms. Bertolini was physically present in Store No. 526 on a weekly basis. (SSUF, ¶ 109). Thus, even if Mr. Tutko's conduct vis-à-vis Plaintiff could possibly give rise to some type of claim – and, it cannot – liability would not attach to Mariano's. *See, Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998); *see also, Faragher v. City of Boca Raton,* 524 U.S. 775 (1998).

11

qualifications; general allegations of better treatment will not suffice." *Stahl v. St. Anthony Medical Center of Crown Point, Inc.*, 103 Fed. App'x. 13, 17 (7th Cir. 2004) (emphasis original). "To prove discrimination under the PDA, [Plaintiff] must show that she was treated less favorably than a nonpregnant employee under identical circumstances…and that her pregnancy was the reason she was treated less favorably." *Piraino v. International Orientation Resources, Inc.* 137 F.3d 987, 990 (7th Cir. 1998).[8]

In this case, Plaintiff would need to present evidence of fellow pharmacy technicians who: (a) were not pregnant; and (b) when returning from leave, were treated more favorably than her. Plaintiff admits she cannot identify any non-pregnant pharmacy technicians who were treated more favorably than her in any respect. (SSUF, ¶¶ 116-117). If anything, the evidence is to the contrary. Even if Plaintiff had been moved to part-time status – she was not (SSUF, ¶ 74) – she would have been treated no less favorably than Brett Anderson and Randolph Ferguson – two male pharmacy technicians who were moved to part-time upon returning from medical leave. (*Id.*, ¶¶ 121-122).[9]

### 2. Mariano's Legitimate, Non-Discriminatory Reasons

Assuming, *arguendo*, that Plaintiff was able to state a *prima facie* case of pregnancy discrimination, the burden would then shift to Mariano's to articulate a legitimate, non-discriminatory reason for its challenged employment decision. *Lewis v. Wilkie*, 2018 WL 6219291

---

[8] An employee is "similarly situated" to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their employer's treatment of them. *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017) ("Similarly situated employees must be directly comparable to the plaintiff in all material respects"). Relevant factors include "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications." *David*, 846 F.3d at 226.

[9] Nor was Plaintiff treated any less-favorably than non-pregnant pharmacy technicians when she was informed that "no hours were ever guaranteed" at Mariano's. (SSUF, ¶¶ 20-24, 39). Other pharmacy technicians – including Plaintiff herself, when she was hired – received the exact same warning. (*Id.*). Finally, to the extent Mr. Tutko ever refused to allow Plaintiff to sit while working, he would have treated her no differently than Julie Hudson, a non-pregnant pharmacy technician who also could not sit while working. (*Id.*, ¶¶ 97, 101-102).

at *5 (7th Cir. Nov. 29, 2018). Mariano's burden of articulation is "quite light," such that "the mere articulation of the reason…puts the onus back on the plaintiff to prove pretext." *Flores v. Preferred Tech. Grp.,* 182 F.3d 512, 515 (7th Cir. 1999).

Mariano's legitimate, non-discriminatory reasons abound. The CBA dictates the hours and pay pharmacy technicians are required to receive, depending on their status (*i.e.,* full-time or part-time). (SSUF, ¶¶ 7-13, 77). The employee handbook explains the process Mariano's uses for scheduling employees, and the requirements surrounding the "Hours of Availability" form – including its admonition that "no amount of hours is ever guaranteed." (*Id.*, ¶¶ 18-23). Regarding Plaintiff's contention that she was not allowed to sit at work, Mariano's does not have any sedentary positions at the store-level; Plaintiff could have submitted a formal ADA request, but she did not. (*Id.*, ¶¶ 97-98). Similarly, Mr. Tutko's directive that Plaintiff would need to pump during break times already provided to her was not only consistent with the CBA (*Id*, ¶¶ 83-87), it directly followed Illinois law, which at that time *required* employees to pump during existing breaks: "The [nursing] break time *must,* if possible, run concurrently with any break time already provided to the employee." 820 ILCS 260/10 (West 2017) (emphasis added).[10]

### 3. There is NO Evidence of "Pretext"

When attempting to show pretext, an employee "must *specifically* refute the facts which allegedly support the employer's proffered reasons." *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 845 (7th Cir. 1996) (emphasis original). An employee's subjective belief or speculation does not constitute evidence and is insufficient to prove pretext. *Murray v. Chicago Transit Authority,* 252 F.3d 880, 888 (7th Cir. 2001). A pretext analysis is limited in scope. *Boss*

---

[10] On August 21, 2018, the Nursing Mothers in the Workplace Act was amended to allow (but no longer require) nursing breaks to run concurrently with existing breaks: "The break time **may** ~~must, if possible,~~ run concurrently with any break time already provided to the employee." 2018 Ill. Legis. Serv. P.A. 100-1003 (H.B. 1595) (West 2018).

13

*v. Castro,* 816 F.3d 910, 917 (7th Cir. 2016) (federal courts are not a super-personnel department; "[i]t is not the role of the court to determine whether an employer's expectations were fair, prudent, or reasonable.") Thus, "[p]retext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Smith v. Chicago Transit Auth.,* 806 F.3d 900, 905 (7th Cir. 2015). Here, Plaintiff can present no evidence of pretext. She understood the CBA governed her hours and compensation, and she admits nobody ever said her pregnancy had anything to do with the work schedule that Mr. Tutko had proposed. (SSUF, ¶¶ 7-13, 46).

### B. THE PART-TIME SCHEDULE DISCUSSED DURING THE DECEMBER 8, 2016 MEETING CONCERNED PLAINTIFF'S CHILDCARE ISSUES – NOT HER PREGNANCY

Plaintiff's lawsuit fails for a more fundamental reason: her discrimination claim involves ***childcare*** issues, not her pregnancy. "All pertinent authorities since the inception of PDA are in accord that Title VII does not prohibit discrimination on the basis of child-rearing activities..." *Barnes v. Hewlett-Packard Co.*, 846 F.Supp. 442, 444-45 (D. Md. 1994) (collecting cases); *see also, Guglietta v. Meredith Corp.*, 301 F.Supp.2d 209, 213-14 (D. Conn. 2004) (no Title VII protection to employee who "had no babysitter or day care…until her husband arrived home from his work shift"). When Plaintiff met with Mr. Tutko in December of 2016, she was neither pregnant nor suffering from any medical condition related to childbirth that would have prevented her from working full-time. (SSUF, ¶ 26). In response to her request for a modified work schedule, Mr. Tutko proposed a schedule of 25 hours per week. (*Id.*, ¶¶ 38-42, 99). However, her scheduling request was unrelated to her *pregnancy*: "she would need to leave by 4:00pm on some days when her husband, Jeremy Kaniewski, would not be able to pick up the children from daycare." (*Id.*).

### C. PLAINTIFF'S "RETALIATION" CLAIM FAILS AS A MATTER OF LAW

Plaintiff's retaliation claim fails for the same reason as her pregnancy discrimination claim: an utter lack of evidence. An employee can establish Title VII retaliation using either the "direct"

14

or "indirect" methods of proof. *Lewis,* 2018 WL 6219291, at *5. Plaintiff's claim for pregnancy retaliation fails under either method, for two reasons.

***First***, both methods require Plaintiff to present evidence showing she suffered an adverse employment action. *Poullard v. McDonald,* 829 F.3d 844, 856 (7th Cir. 2016) ("Federal law protects an employee only from retaliation that produces an injury."). That didn't happen here. Plaintiff resigned before she experienced any decrease in hours or pay. (*See, supra.*, pp. 4-7).

***Second***, both methods of proof require Plaintiff to prove she engaged in statutorily protected activity. Title VII prohibits an employer from retaliating against an employee for opposing or participating in an investigation of an unlawful employment practice. 42 U.S.C. § 2000e-3(a). In this case, the only opposition or investigatory conduct that could even arguably qualify as "protected activity" under Title VII would be the following:

- Plaintiff met with Ms. Kulawiak (the PSM) and Mary Keane (her Union representative) one time – in "March, April, May of 2016. One of those months" – to discuss Mr. Tutko's supposed refusal to allow her to sit while working. (SSUF, ¶ 105). However, Plaintiff is unable to recall either what she said to them, or what they said in response. (*Id.*).

- Plaintiff spoke with Ms. Kulawiak "a few times" about how Mr. Tutko "was not pleasant about how I would be working and having kids" and "wanted someone who didn't have kids working back there." (SSUF, ¶ 106).

Even if this conduct was sufficient to qualify as "protected activity," Plaintiff's retaliation claim nonetheless fails because the person who allegedly retaliated against her – Mr. Tutko – had no knowledge of her complaints about him. (SSUF, ¶ 112).[11] Without a showing that Mr. Tutko (the alleged "retaliator") had actual knowledge of her "protected activity," Plaintiff cannot claim

---

[11] Neither the VP of Human Resources, nor the District Pharmacy Manager (Mr. Tutko's direct supervisor), were aware of any complaints about Mr. Tutko – by Plaintiff or anyone else. (SSUF, ¶¶ 109-111).

15

retaliation. *See, Salas v. Wisconsin Dep't of Corr.,* 493 F.3d 913, 924 (7th Cir. 2007) (plaintiff required to show employer had actual knowledge – not merely that employer "could have or should have known about" her protected activity – to sustain a claim for Title VII retaliation). Indeed, absent a showing of actual knowledge by Mr. Tutko, Plaintiff could never prove the "but-for causation" necessary for her to proceed with a retaliation claim. *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 360 (2013). Like her discrimination claim, Plaintiff's claim for "pregnancy retaliation" fails before it begins.

### III. CONCLUSION

Plaintiff cannot meet her fundamental burden in this pregnancy discrimination case; she "has not shown that if all of the facts were identical but she were not pregnant, she would have been treated differently." *Piraio v. International Orientation Resources, Inc.*, 137 F.3d 987, 991 (7th Cir. 1998). Taken as a whole, the evidence is undisputed and can yield but one result: summary judgment in favor of Mariano's on all claims asserted in Plaintiff's Complaint.

Dated: December 17, 2018        Respectfully submitted,

**ROUNDY'S ILLINOIS, LLC, d/b/a**
**MARIANO'S, Defendant**

By: */s/ Christopher S. Griesmeyer*
    One of Its Attorneys
    Christopher S. Griesmeyer (ARDC No. 6269851)
    GREIMAN, ROME & GRIESMEYER, LLC
    Two North LaSalle St., Suite 1601
    Chicago, Illinois 60602
    (312) 428-2750
    cgriesmeyer@grglegal.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 17, 2018, a copy of the foregoing *Memorandum of Law in Support of Defendant's Motion for Summary Judgment*, was filed with the Court's CM/ECF system, which will provide notice to all counsel of record registered to receive notices, at the addresses listed below:

> Michael I. Leonard
> Madelaine Thomas
> Leonard Meyer, LLP
> 120 North LaSalle, 20th Floor
> Chicago, Illinois 60602
> mleonard@leonardmeyerllp.com
> mthomas@leonardmeyerllp.com

> */s/ Christopher S. Griesmeyer*
> Christopher S. Griesmeyer
> GREIMAN, ROME & GRIESMEYER, LLC
> Two North LaSalle St., Suite. 1601
> Chicago, Illinois 60602
> Telephone: (312) 428-2750
> Facsimile: (312) 332-2781
> cgriesmeyer@grglegal.com