# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

BREANN KANIEWSKI,

    *Plaintiff,*

v.

ROUNDY'S ILLINOIS, LLC,

    *Defendant.*

No. 18 C 2082

Judge Virginia M. Kendall

## MEMORANDUM OPINION AND ORDER

Plaintiff Breann Kaniewski brought a one count Complaint against her former employer, Defendant Roundy's Illinois, LLC (d/b/a/ Mariano's). Plaintiff, who was employed as a pharmacy technician, alleges that Defendant violated Title VII of the Civil Rights Act, as amended by the Pregnancy Discrimination Act, when one of its store managers proposed reducing her work schedule in anticipation of her return from pregnancy leave. Defendant now moves for summary judgment on the grounds that Plaintiff never experienced an adverse employment action, among other reasons. For the reasons stated below, Defendant's Motion for Summary Judgment is granted.

## BACKGROUND

Plaintiff was hired on December 12, 2015 to work as a full-time pharmacy technician in the Shorewood, Illinois, Mariano's store. (Dkt. 32, ¶ 4). When she began her employment, Plaintiff read and acknowledged receipt of the Mariano's Employee Handbook which puts employees on notice that they are never guaranteed a certain

number of hours. (*Id.* at ¶¶ 18, 20). Pursuant to the operative collective bargaining agreement, pharmacy technicians are paid on an hourly basis while pharmacists at Mariano's are salaried positions. (*Id.* at ¶ 7). The CBA further defines full-time employees as those who work at least 35 hours per week. (*Id.* at ¶ 11). Full-time pharmacy technicians are considered "Level 3" employees and receive a higher hourly wage range than part-time, "Level 2" technicians. (*Id.* at ¶ 12). Plaintiff began her employment at Mariano's as a Level 3 technician, earning $14.85 an hour. (*Id.* at ¶ 13).

Three months after being hired, Plaintiff informed Defendant in March 2016 that she was pregnant. (*Id.* at ¶ 24). She eventually was granted a leave of absence which lasted for approximately three months, including the time immediately before and after she gave birth. (*Id.* at ¶¶ 25, 27-28). Plaintiff's last day of work before her pregnancy leave was September 2, 2016, and she was scheduled to return to work in December 2016. (*Id.*).

Prior to Plaintiff's return to work, Ryan Tutko, the pharmacy manager, scheduled a meeting with Plaintiff in early December 2016. (*Id.* at ¶¶ 33-35). The purpose of this meeting was to discuss Plaintiff's hours of availability upon her return from pregnancy leave and to place her back on the store's work schedule. (*Id.*). During the meeting, Plaintiff told Tutko that she wanted to return to work on a full-time basis but would require a modified work schedule to accommodate her childcare needs. (*Id.* at ¶ 38). Tutko expressed that he did not have a problem with a modified work schedule. (*Id.*). Because of this, Plaintiff was required to complete a new "Hours

of Availability" form, which again contained language advising employees that no amount of hours is ever guaranteed. (*Id.* at ¶ 39). Plaintiff understood at the time of this meeting that if she worked less than 35 hours per week, she would not be considered a full-time employee and would likewise see a reduction in her hourly wage. (*Id.* at ¶¶ 40-41, 45).

Also, during the meeting between Plaintiff and Tutko, Tutko gave Plaintiff a copy of his scheduling notes which suggested a schedule of 25 hours per week for Plaintiff starting on December 19, 2016. (*Id.* at ¶ 42). December 19, 2016 was the earliest possible day that Plaintiff could return to work as prescribed by CBA rules. (*Id.* at ¶¶ 43-44). The People Services Manager—not Tutko—is solely responsible for preparing the storewide schedule, with ultimate approval by the Store Director. (*Id.* at ¶ 53, 55-56). While Tutko submits his scheduling notes to the People Services Manager, these notes are often rejected and other schedules are implemented. (*Id.* at ¶ 57). Specifically, Tutko's proposed 25 hour schedule for Plaintiff could not have been implemented because the scheduling software would not have permitted Plaintiff to be scheduled for less than 35 hours per week. (*Id.* at ¶ 58). The only individual within the Mariano's entity with the authority to change Plaintiff's status from a full-time employee to a part-time employee was the Vice President of Human Resources. (*Id.* at ¶ 66).

Instead of returning to work as scheduled, Plaintiff resigned on December 17, 2016, via fax. (*Id.* at ¶¶ 27, 31). Plaintiff never worked under the part-time schedule

as proposed by Tutko in the December meeting, nor did she ever receive a reduction in pay. (*Id.* at ¶¶ 68-70, 74).

## **LEGAL STANDARD**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Sorensen v. WD-40 Co.,* 792 F.3d 712, 722 (7th Cir. 2015). In determining whether a genuine issue of fact exists, the Court must take the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *see also Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. A failure to make a showing of just one element of the *prima facie* case is fatal to a plaintiff at the summary judgment stage. *See Arizanovska v. Wal-Mart Stores, Inc.,* 682 F.3d 698, 702 (7th Cir. 2012). If plaintiff satisfies the *prima facie* elements, the burden shifts to the defendant to proffer a legitimate and nondiscriminatory reason for the allegedly discriminatory action taken. *Id.* Then, if defendant offers a nondiscriminatory reason, the burden

returns to plaintiff to "produce[] evidence that the proffered reason was a pretext for improper discrimination." *Id.*

The Court "limit[s] its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees,* 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the Court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Anderson,* 477 U.S. at 248; *Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.") (internal quotations omitted).

## DISCUSSION

**I. Pregnancy Discrimination Claim**

Plaintiff's pregnancy discrimination claim fails as a matter of law almost as soon as it begins as she fails to present sufficient evidence to make a *prima facie* showing of employment discrimination. Quite simply, Plaintiff did not suffer a cognizable injury in the form of an adverse employment action—an undisputed fact that is fatal to her claim.

At the summary judgment stage Plaintiff must "present evidence that (1) she is a member of a protected class, (2) she was meeting the [Defendant's] legitimate

expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably." *Fields v. Bd. of Educ. of City of Chicago,* 928 F.3d 622, 625 (7th Cir. 2019). Here, Defendant does not contest that Plaintiff has satisfied the first two elements of her claim, but instead challenges the latter two prongs, focusing the bulk of its argument on the adverse employment element. *See* Dkt. 23, pg. 3. For her part, Plaintiff responds that she suffered an adverse employment action by way of being constructively discharged when Tutko "slashed [her] pay down to minimum wage; cut her hours from full-time to less than 20 hours per week (*i.e.,* to part-time status); and indicated that there was no guarantee that she would be scheduled for any hours at all." Dkt. 32, ¶ 67.

An employee's constructive discharge can satisfy the adverse employment element and has been recognized in two forms. "The first occurs when a plaintiff resigns due to discriminatory working conditions even more egregious than that required for a hostile work environment claim. … The second occurs when an employer acts in a manner that would make clear to a reasonable employee that she will be immediately fired if she does not resign." *Fields,* 928 F.3d at 625 (internal citations and quotations omitted). The first type of constructive discharge "require[s] a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress … thereby allowing an employer to address a situation before it causes the employee to quit." *Chapin v. Fort-Rohr Motors, Inc.,*

621 F.3d 673, 679 (7th Cir. 2010). One such method of establishing constructive discharge under this avenue is when there is a personal threat to plaintiff's safety. *Id.* The second form of constructive discharge requires "the plaintiff to show that his working conditions had become intolerable." *Id.* Importantly, "a working condition does not become intolerable or unbearable merely because a 'prospect of discharge lurks in the background.'" *Id.* (quoting *Cigan v. Chippewa Falls Sch. Dist.,* 338 F.3d 331, 333 (7th Cir. 2004)).

Addressing each theory in turn, Plaintiff first fails to establish constructive discharge under a theory of discriminatory working conditions. Plaintiff asserts that Tutko, her manager, was responsible for creating a discriminatory work environment. Specifically, she alleges that Tutko would not allow her to sit while she was at work, told her that "working with kids would not work out," and told her that she would have to pump breast milk during her two fifteen minute breaks. *See* Dkt. 34, pgs. 4-7. Even when taking these allegations as true for purposes of this Motion, the isolated actions and pregnancy-related remarks fall far short of the demanding threshold necessary to establish constructive discharge. Notably absent from Plaintiff's allegations are any threats of violence or harm to her personally. Though personal threats are not necessary, some sort of similarly egregious discriminatory actions or remarks, are required to meet the constructive discharge standard under this theory. *See Fields,* 928 F.3d at 625 ("She has no evidence that she was subjected to a threat of violence or other conditions that are more severe than those required to establish a hostile work environment."). Taken in the aggregate, Plaintiff's sporadic

<em>Page 7 of 13</em>

allegations would even fail to meet the lower threshold of a hostile work environment. *Whittaker v. N. Illinois Univ.,* 424 F.3d 640, 648-49 (7th Cir. 2005) ("Because, as we have already found, [plaintiff] has failed to show work conditions so egregious as to meet the stringent hostile work environment standard, she certainly cannot reach the even higher threshold required to show a constructive discharge."). While the purported comments from Tutko are no doubt inappropriate they do not come close to being "objectively intolerable" especially when considered in light of other discrimination cases where plaintiffs failed to establish a hostile work environment. *Fields,* 928 F.3d at 625; *see also Fischer v. Avanade, Inc.,* 519 F.3d 393, 410-11 (7th Cir. 2008) (finding no constructive discharge where plaintiff was told that she had to relocate or transfer); *Overly v. KeyBank Nat. Ass'n,* 662 F.3d 856, 862 (7th Cir. 2011) ("While both inappropriate and condescending, Bielecki referring to Overly as 'cutie' 5 to 10 times over the course of two months is not sufficiently severe or pervasive to create a hostile work environment by itself…"); *Scruggs v. Garst Seed Co.,* 587 F.3d 832, 841 (7th Cir. 2009) (sporadic comments that plaintiff was "made for the back seat of a car" and looked like a "dyke" were not physically threatening and did not rise to the level of an objectively hostile work environment). Accordingly, no reasonable factfinder could conclude that Plaintiff was constructively discharged by way of discriminatory working conditions. Plaintiff's allegations fall short of establishing a hostile work environment, much less the heightened standard which is reserved for particularly egregious conduct.

Plaintiff next suggests that she was constructively discharged due to the threat of her imminent termination. To establish a claim of constructive discharge by way of imminent termination, plaintiff bears the burden of showing that it is all but certain she will be fired from her position. *See Fischer,* 519 F.3d at 409 ("In other words, constructive discharge also occurs where, based on an employers actions, the handwriting [was] on the wall and the axe was about to fall.") (internal quotations omitted). Plaintiff contends that she suffered an adverse employment action when she was told she would receive a cut in her hours and pay. This argument highlights the fundamentally fatal flaw underlying the entirety of Plaintiff's Complaint and theory of the case—that she was not constructively discharged because she voluntarily resigned from her position as a pharmacy technician.

Here, it is undisputed that Plaintiff voluntarily resigned from her position on December 17, 2016, *before* she ever worked a reduced schedule or received a reduction in pay. Dkt. 32, ¶¶ 68-70, 74. A careful read of Plaintiff's arguments, all phrased in the future tense, confirms that she proceeds on a theory of future adverse employment actions. *See e.g.,* Dkt. 34, pg. 8 ("…told her that she *might not* work any more hours at all…") (emphasis added). Tutko's "threat" of reducing her scheduled hours and pay did not send the objectively clear message that Plaintiff's termination was inevitable. Part-time status, while perhaps not preferable to Plaintiff, is far from termination. *See e.g., Hamer v. Neighborhood Hous. Servs. of Chicago,* 2015 WL 5439362, at *12 (N.D. Ill. Sept. 10, 2015), aff'd, 897 F.3d 835 (7th Cir. 2018) ("While the Court recognizes that accepting the administrative position was not preferable to

Plaintiff because of the reduction in pay and the increased travel expenses, her situation does not rise to the level of being intolerable."). However, even if it could be said that a reduction in hours is tantamount to termination, the threat of future harm simply cannot amount to an adverse employment action. *Lewis v. Wilkie,* 909 F.3d 858, 870 (7th Cir. 2018) (holding that an "unfulfilled threat of discipline" and "threat of future discipline" which "result[] in no injury or harm greater than stress and worry" do not constitute an adverse employment action); *Rohler v. Rolls-Royce Corp.,* 523 F.App'x 418, 421 (7th Cir. 2013) ("The threat of termination … was unfulfilled, and an empty threat is not a materially adverse employment action."); *Poullard v. McDonald,* 829 F.3d 844, 856-57 (7th Cir. 2016) (holding that a threat of future harm, without actual economic harm is not an adverse employment action). Plaintiff's concession that she did not ever work a reduced schedule or receive a lower wage ultimately sinks her claim. Because plaintiffs are normally required to stay employed so that a resolution can be reached within the confines of the employer's resolution process, a hypothetical adverse action that is never actually realized is not considered an adverse employment action. *Nagle v. Vill. of Calumet Park,* 554 F.3d 1106, 1120-21 (7th Cir. 2009) ("Nagle did not suffer any hardship connected with the suspension because he never actually served it."). Plaintiff complains of a reduction in her hours and pay, yet never once worked a week under the reduced hours structure or received a single paycheck at a lower hourly wage. (Dkt. 32, ¶¶ 68-70, 74). Additionally, the governing collective bargaining agreement would not have allowed Plaintiff to return

to work until December 19, 2016—notably *after* she submitted her resignation letter. (*Id.* at ¶ 43-44).

Plaintiff's attempt to litigate anticipated consequences is impermissible. *See Cigan,* 388 F.3d at 333-34 ("The only way to know how matters will turn out is to let the process run its course. Litigation to determine what *would* have happened … is a poor substitute for the actual results…") (emphasis in original). Even when given the most generous interpretation, Plaintiff simply cannot plead around the fact that she voluntarily resigned from her position before any of the alleged adverse actions were implemented. The mere prospect of a reduction in hours or pay is not an adverse action. *See e.g., Golden v. World Sec. Agency, Inc.,* 884 F.Supp.2d 675, 693-94 (N.D. Ill. 2012) (finding that summary judgment is appropriate, consistent with *Whittaker,* where plaintiff quit before experiencing a reduction in hours). Therefore, in the absence of an adverse employment action, Plaintiff's pregnancy discrimination claim must fail as a matter of law. There is no triable issue of fact and summary judgment is granted in favor of Defendant.

## II. Pregnancy Retaliation Claim

While Plaintiff's Complaint facially alleges just one count of pregnancy discrimination, the language of the Complaint also speaks to a claim of retaliation. *See* Dkt. 1. While this certainly presents a different theory of the case, the applicable standard is much the same. "To survive summary judgment [plaintiff] need[s] evidence that would permit a reasonable factfinder to conclude that her engagement in protected activity caused a materially adverse employment action." *Fields,* 928

F.3d at 626. Not unlike establishing a claim of discrimination, the fact that Plaintiff must demonstrate she suffered an adverse action is inescapable. Accordingly, the reasoning outlined above is equally applicable here, whereas in *Fields,* Plaintiff "cannot establish that she suffered an adverse employment action … let alone one taken with the intent to retaliate." *Id.* Once again, potential and prospective employment actions *cannot* permit a reasonable factfinder to conclude that Plaintiff was retaliated against. *Id*; *see also Madlock v. WEC Energy Group, Inc.,* 885 F.3d 465, 472 (7th Cir. 2018); *Poullard,* 829 F.3d at 846 ("While we do not doubt that the possibility of discipline can be stressful, we have previously held that this kind of threat is not enough to support a claim for retaliation."); *Chapin,* 621 F.3d at 679.

Plaintiff's failure to establish the adverse action prong in her retaliation claim, as with her discrimination claim, makes summary judgment the appropriate vehicle to dispose of the case. *See Arizanovska,* 682 F.3d at 702. The undisputed material facts make it abundantly clear that Plaintiff voluntarily resigned from her position and as a direct result of her decision, she never suffered an adverse employment action.

## **CONCLUSION**

For the reasons stated within, Defendant's Motion for Summary Judgment (Dkt. 22) is granted and Plaintiff's case is dismissed. Plaintiff's discrimination and retaliation claims fail as a matter of law because she voluntarily resigned from her position and never suffered an adverse employment action. Additionally, Defendant's

Motion to Strike certain portions of Plaintiff's Local Rule 56.1 Response is dismissed as moot.

_____
Virginia M. Kendall
United States District Judge

Date: August 5, 2019